All right, good morning again and welcome to all to this session of our panel. We have five, well, the court has five panels sitting this week. We actually have one panel sitting in Fort Worth at the law school there. The other panels are sitting here in New Orleans. And our panel is sitting in New Orleans today. We're delighted to be out here too. Unlike some circuits, our circuit has a history of being friendly to sitting at law schools and so forth. We don't do it all the time, but it's fairly often that we will sit at various law schools. And so as I said, this week we have a panel that's sitting at the law school in Fort Worth, which is the first time that we've been there, but we enjoy it. But what you'll see in here is exactly what would occur if we were in the John Miner Wilson Building. It's a pleasure and honor for me to sit this week with Judge Jack Weiner. Judge Weiner, as many of you may know, is a native of Shreveport. His family law firm is still there. His relatives there, me with his sister. And once upon a time when I was a state trial judge, I actually presided over a case in which Judge Weiner was the litigant on one side, and Honorable Tom Stack, U.S. District Judge, was the litigant on the other side. And it was about a thousand pound real estate ground lease that at 35 years of age, I was supposed to tell them what they meant when they mutually negotiated this lease. But at any event, the witnesses were intimidating, to put it mildly. But it's one of the fond memories that I have working with Judge Weiner. And so he is here. He's been in New Orleans for a while. My colleague to the right, Judge Southwick, from Jackson, Mississippi. At least for now he is, but he's going to be going to Austin to be near his Jonas Adair colleague, his prior military background. It's a joy to sit with him. He's a scholar, very intellectually gifted, and so it's a pleasure to sit with him. So we have a batch of very interesting cases. You can't beat this job for variety, trust me. And so one of the things we slug through, we don't argue all the cases. So we have 20 cases on the docket, maybe 10 or so maybe get argued. The others we're deciding on the briefs. So the cases that are set for argument, like these, are what I call the gray area cases. And so we benefit from the argument of counsel to help us flesh out. Unlike when I was in state court, the judges might not know very much about it. And so the lawyers would get up and start in genesis, telling you about the case. And they'd work all the way to revelation, you know, all they had. Here it's what you call a hot bitch. So we've read the briefs. We've probably, now in the rulings of the judges, we've read a whole bunch of cases. Our law clerks are here with us most of the time. We have school sessions to get ready for the case. And I explained to my wife, who wonders why there's been so much time there, that preparing for an argument is like studying for finals. And so a lot goes in it. So when we get here, we're looking forward to hearing from counsel so that we can clarify in our heads what the cases are about and that today. So that said, we express appreciation to counsel for coming to Tulane to make your arguments as opposed to the courthouse. So that said, the first case for argument number 24-10172, United States v. Wesley Swick. Mr. Brown, you're up. Thank you, your honor, and may it please the court. One way or another, the district court erred. On the law, the district court's ruling on the fugitive tolling doctrine cannot be squared with the text, context, purpose, or history of the statute's governing supervisor lease. Before the Censoring Reform Act of 1984 created supervisor lease, courts in Congress had consistently recognized the hand-in-hand relationship between the tolling doctrines for recidivists and fugitives. In section 3624E, Congress chose to codify only one tolling doctrine but not the other. That choice therefore communicates exclusivity, and this court should apply the negative implication canon to resolve the legal dispute in Mr. Swick's favor. As for the facts, the district court erred by equating evidence of Mr. Swick's failure to report for an initial meeting with evidence of fugitive status. In short, the district court could not infer from a single sin of omission the additional acts or intent necessary to support fugitive status, a looking all the evidence pointing in the other direction. At this point, I welcome the court's questions, but if there are none yet, I would like to begin today's presentation with the legal dispute presented by this case. Counsel, you say that 1984 Censoring Reform Act brought forward one tolling and not the other. I'm curious if the Fifth Circuit panel, with your own opinion, somewhat took the same approach. What are you relying on to say that either it's general common law had tolling or some prior statute had tolling, and here are the categories and only two of them were brought forward in the Censoring Reform Act? A fair amount of research on that. I'm not seeing that there were these established, particularly as to something like supervised release, parole, probation, the kinds of clarity to the rules that in a way both sides are saying were there. So what was brought forward in the statute? I think the best evidence, Judge Southwick, is the pre-Censoring Reform Act parole statute. That's 18 U.S.C. section 4210. And in that statute, Congress saw fit not to rely on the common law, but to codify a tolling doctrine for recidivists and to codify a tolling doctrine for fugitives. So within a single... 4210 is not a word of statute in light of how supervised release works today and parole commissioned as the center of that statute. But what Judge Willett wrote about in Cartagena, whatever the other name in that case is, Withdrawn Opinion, said, I don't remember now the wording, but basically clearly established common law was not rejected by either the 84 or the current, by the 84 statute. I'll leave it at that. Do you have anything that would show what the common law was outside of the statute? We do, Your Honor. The repealed probation statute, section 3651, indicated that a period of probation together with any extension thereof shall not exceed five years. So that statute was unlike 4210 in that it did not codify either tolling provision. So without a contrary indication in the text, courts saw fit to import the common law approach that had been crafted to deal with escaped convicts and parolees to the probation context. And courts did that because the two tolling doctrines go hand in hand with one another. This court recognized that point in a case called United States v. Fisher from 1990. That was about the probation statute that was building off the Fourth Circuit's work in a case called U.S. v. Workman from 1980. And Workman was addressing that probation statute and indicated that the efforts to calculate the maximum five-year term had been the subject of considerable litigation. That was the term they used. And they recognized that there were a series of tolling doctrines that had been drawn from the common law that all were unified with a common principle, which was that a probationer cannot obtain credit against the five-year period for any period of time during which he was not in fact under probationary supervision by virtue of his own wrongful acts. They then applied that to both intervening imprisonment and fugitives because the rules were designed to do the same thing and to achieve the same purpose. So Congress is legislating in the Censoring Reform Act not just against the background of the common law, which courts up until 1984 had imported into the probation statute, but they're also dealing with the background of the parole statute in which they had codified both of those common law rules. So if they were going to rely on the common law with supervisor lease, we would expect them to take the same all-or-nothing approach, either codify neither tolling doctrine and allow courts to apply the common law or do what they did in 4210 and apply both. 3624E actually provides a mirror image to 4210 but with one significant omission. Just like 4210 did, 3624 gives us all the rules that we need to calculate a term of supervisor lease. We know when it begins. We know that it runs concurrently with any other forms of supervision, be they parole, supervisor lease, or probation. And we also know that it tolls during any period of imprisonment related to a condition unless you serve less than 30 days. So Congress... Let me ask you about factual distinctions. This case, the subsequent offenses for which perhaps Judge O'Connor properly further sentenced him as a revocation, all occurred within the original time period of what supervisor lease would have been, correct? I think that's right. 2017 to 2019. Other cases, including the Cartagena case, it was post that time period. So it really doesn't seem to me here we're talking about tolling, where in Cartagena maybe we were. We're trying to extend the time period in which the applicability of these terms, restrictions, conditions apply. Seems to me what we're really talking about here is something like effectuating the supervisor lease period during the period declared in the court order, but the person never did appear to start his supervision. Seems to me there may be some distinction there where perhaps this case is a stronger one for saying those terms apply. That when he starts committing these crimes, the law would recognize that he's in that time period and it can be effectuated as Judge O'Connor did in this case. I'm making up terms, but isn't there some distinction? I don't think so, Your Honor. And I think that goes to questions about purpose, that goes to questions about history. But ultimately 3583 answers all those questions for us in subsection I. Subsection I preserves a district court's authority to revoke an individual like Mr. Swick who either does not appear or begins committing crimes during a term of supervision. And it allows the district court to revoke them after the expiration of the term, so long as a warrant is issued during the term. Let me ask you, what's the prominent standard of review? Are we looking just at de novo at the moment? So what's our governing standard of review? You know, the judge looked at this, he drew the inference about your client's intent, etc. So that's not de novo, right? That's not de novo, Your Honor. The question that features of status is subject to the clear error standard of review. But these are separate issues. There is on the one hand... I just want to make sure we're all the same. Well, the good news for me is I only need one to win. And I think the de novo issue might actually present the easier win for us because I think all the evidence points in the same direction. So even if Mr. Swick is a fugitive, the fugitive tolling doctrine is not textually permissible given 3624E, given 3583E, and 3583I. On that point, Your Honor, I would like to follow up on the question of purpose. And I think this is an issue that Cardigan and Lopez got wrong. I think it's an issue that the government got wrong as well because they're taking a myopic approach to the question of supervised release and what is its purpose. So the fact of the matter is that supervision does have a rehabilitative purpose, but supervision is not the only goal that we can extract from the statutes governing supervised release. Those statutes have always allowed for recalcitrant offenders to face revocation. So there are, in fact, two purposes baked into the statute. The first is rehabilitation for those who submit to supervision. And the second is revocation for those who fail to submit and fugitives necessarily violate, effectively, all the terms of supervision. And that's been the case since the very beginning. 3583E, even before we had subsection I added to the statute in 1994, allowed for the revocation of supervisees. And the language of the statute prior to subsection I allowed for the revocation even after the term of supervised release, so long as a warrant was issued during the term. So ultimately... Let me take you back to my question. If it took you all that to explain it, how in the world can the error, if error, be clear? I don't mean that facetiously. I just mean the standard is clear error. We write for multiple audiences, as you know. One of the most important are the trial judges. And so if we reverse to say, well, it was a clear error, does O'Connor and the rest hold him up? What am I supposed to do, right? So articulate for me what the panel's holding would be to say that the trial judge clearly erred so that he and other judges would know, oh, okay. I mean, I understand the relief you want. I'm just saying, say for me, what would the articulation be of the clear error here? Absolutely, Judge Stewart. I don't mean to fight the hypothetical or the premise of the question too hard. But at the outset, all I point out is that future tolling does not apply. We don't even have to get to that factual question. But if future tolling does apply and we get to the factual question, I think there's clear error here for two reasons. The first is that there's an obvious mismatch between the evidence the district court relied on to find fugitive status and the types of evidence of intent that we would need to actually reasonably infer fugitive status from the facts on the record. And what I mean by that is a fugitive isn't just a violator. A fugitive goes beyond violation and attempts to erect an insurmountable barrier between himself and probation. So the classic evidence that we would look for in terms of fugitive status would be invasion or flight. Here we have evidence of neither one of those points. And by confusing evidence of a violation with evidence of fugitive status, the district court made an unreasonable inference. I'm not arguing about whether or not there is competing evidence in the record or whether or not the district court made a reasonable inference from the evidence that was there. I'm saying there's no evidence of fugitive status. And that's one way to show clear error. I think that's a relatively straightforward rule that could be understood and applied in the future. But the problems are twofold because the district court didn't just ignore an evidentiary gap. It also overlooked all the evidence in the record pointing the other direction. So we know that Mr. Swick submitted to parole at the state level twice and for a total of about eight months. We have that in the petition at record site 108. And we have that in the PSR that was put together for the new case at record sites 392 and 395. We also know that all of his in the record that he ever left Wichita Falls following his just discharge from TDCJ. You get that from the petition at record sites 105 to 108 and the new PSR from 394 to 96 and at 399. Now we actually have additional evidence in the PSR that establishes his whereabouts. And again, this is not someone who's living under an assumed identity and this is not someone who's taken flight in an attempt to avoid supervision entirely. We know the fact that he worked as a handyman for a landlord with multiple rental properties in Wichita Falls from June to September 2022. That's at record site 403. And the PSR indicates that he was living with a friend for about a month before his arrest in September 22. That's at record site 401. The last point on that I would make, Judge Stewart, is that in addition to all that evidence that undercuts the district court's finding a fugitive status, we also have as many arrests. And there's no indication that he ever tried to hide his identity or do anything else that would have erected a barrier between himself and probation. So when you have a situation where the district court... Being a fugitive is not a passive status. No, it's absolutely. You can't be a fugitive by accident. You have to take some sort of act and it has to be intentional to erect an insurmountable barrier between yourself and probation. And we don't have anything along those lines here. And it wouldn't take much on the clear air standard. All we would need is some sort of admission from Mr. Swick, either to a pretrial services officer or police, or any other evidence of flight or evasion, and ultimately we have nothing. We've only got a minute and 40 seconds left, but I'd like to move back to the very beginning and talk about the negative implication issue again as it relates to the statutory question, which is, of course, on de novo review. So Congress and the courts recognized before the Censoring Reform Act that fugitive tolling and, pardon me, fugitive tolling and tolling for recidivist went hand in hand. They had done so for many years, going back to the Supreme Court's 1923 decision, Anderson v. Corral. And because they go hand in hand, Congress's decision to omit the fugitive tolling rule in 3624 communicates exclusivity. Now the negative implication necessarily depends on context, but the more specific the enumeration, the greater the force of the negative implication. And here, the associated group or series is a closed universe of two tolling rules. And before creating supervisory release, Congress had expressly codified both in the parole context. So given that statutory history, Congress could have easily done the same in section 3624E, but it did something different. And given that longstanding relationship between the two tolling doctrines, the decision to include one implies the exclusion of the other. And on that point, your honors, I would just recommend rereading the opinions from the 11th and First Circuit, because they deal with that statutory history, and they deal with the text of the statutes primarily. I think Carnegie and Lopez and the opinions coming out the other way are elevating context, purpose, and the common law to supreme importance when the statute itself answers the questions. Does being a fugitive require intent? Yes, your honor, I believe it does. What kind of intent? Oh, intent to either evade supervision or to skip town, to leave the jurisdiction. I think in this case, we have evidence of neither of those points. Thank you, your honor. All right, thank you, Mr. Brown. You've reserved your five minutes for rebuttal. We'll hear from the jury in the spring. Let me ask you the same question at the beginning. Does being a fugitive require intent, and what kind of intent? Yes, your honor, and good morning. May it please the court, Amber Grand, for the United States. This court explained in United States v. Fisher that the fugitive tolling doctrine is invoked when you have wrongful action or inaction. That's all that's required. We have to have wrongful action or inaction, and here that wrongful inaction was the failure to report for supervision, which led to a total and complete evasion of the service of that key component of his sentence. So does that mean everybody who doesn't report for supervision is definitionally a fugitive? The doctrine, of course the court would have to assess the equitable doctrine and decide if their failure to report was an intentional effort to remove them from the court's supervision. Well if somebody knows they're on supervision, they know they're supposed to show up. They've got the piece of paper, they've been told, etc. etc. So I mean, they know. So if they don't, they are not only in violation, but they're a fugitive? If they fail to report to evade that portion of their sentence, the court in established fugitive status. It can establish? It can. I think in applying an equitable doctrine, the court would have to look at the sum of the facts, and the court would have to determine by the sum of their conduct, were they evading? So the government would decide who to go after as a fugitive versus the people who just don't show up? Well in the typical case, you would have a probation officer who was aware that they weren't reporting. We have an anomaly here where the state didn't alert the federal system that he had been released from custody. So typically your probation officer would report that in a petition to the court and say he failed to report, or he's not filing regular monthly reports, or he didn't tell me that he moved, and the defendant would be called into court to answer for that. Here we have an outlier. We have a case where the federal system wasn't aware. The federal term was served concurrently with three or four different state sentences, so it wasn't even clear when he would be released. Correct me if I'm wrong. Somebody fails to report, probation office notifies them. Somebody rules them back in the court before the judge just looks over and says, did not tell you to report. If you did, all right, I'm gonna put you back in jail if you don't show up. That kind of drill scares the person or whatever, but it's just clueless that the judge is thinking about, okay, you're now a fugitive. You just disobeyed the rules. You didn't show up when you should. You think I wasn't serious when I said, if you don't report, I'm gonna put you in jail. So just this notion of being a fugitive, as counsel is arguing, it's a little nebulous. I'll just put it that way. I'm not saying you win. I'm just trying to understand the import of the argument. Okay, go ahead. And I do think it's important to talk about how a fugitive in the supervised release context is different than a fugitive in other contexts like fugitive disentitlement, statute of limitations. You have severe sanctions in those contexts, and so courts applying those doctrines have imposed this requirement that you flee or that you hide. But as the court in Muguder-Oliveros explained, that's not required in fugitive tolling, because here, the consequence is merely requiring you to serve the sentence you were supposed to serve in the first place. And so what's required to establish fugitive status is your intentional evasion of that sentence, and that's what we have here. Judge O'Connor made the factual determination at the revocation hearing that Mr. Swick became a fugitive when he failed to report. He based that on two facts. He said, I told you at your sentencing that you had to report, and the written judgment told you that within 72 hours, you had to report. The inference I draw from that is that you knew you had to report, and you intentionally failed to. That inference was supported both by his criminal history leading up to that conviction, his repeated violations of parole and probation, and his conduct after he absconded from supervision. He continued unabated, violating the law. When Mr. Swick claimed at the revocation hearing it was an accident, the court said, do you have any evidence of that? And he said, no. So at best, he offered a competing inference, which is what he does today. But offering a competing inference, even a compelling one, even if this court might have come to a different conclusion, doesn't establish clear error. You have to- You're talking about the evidence right now, which is where you were directed. Let me ask you about, make sure I'm understanding that you've addressed it to some extent. Now, this is an unusual situation, where after he's sentenced with this obligation to report, he then served a fairly lengthy state sentence of five years or so. And this period, an obligation to report, started when he's released from state prison. Was there- After five years, he's not retained the memory that he's supposed to have been within 72 hours after finally getting out of state prison, report to federal probation. If he can convince the court of some sort of goodwill here, is that a reason that he's not a fugitive? Or is it just, as you said earlier, it comes down to equitable factors? I think if he had produced evidence, a girlfriend, a friend who had said he thought he was done, he told me, I'm done with my federal sentence, I've just got this state parole piece. Some sort of evidence to indicate that it was an accident or a mistake, that would weigh against- Was any evidence of probation or state prison upon his release? Federal probation somehow notified him, by the way, don't forget us, it's been a long time, but we're here and we want you. Right. There's no evidence of that, is there? We don't have evidence of that. We have evidence that he sustained federal- So what does he have to show, what would he have had to show, and didn't in your mind, that this is somehow a good faith reason? Of course, there's not a lot of good faith in the story here, I'm not trying to overstate it, but this fellow's done some bad acts, but we're going to make some law here, potentially, and we need to get it right. So what would have excused him? You talk about some friend excused with, it seems to me a guy who's been in state prison doing, thinking of a lot of other things other than reporting this federal probation officer, would easily just not recall that he was supposed to be doing this. Sure. That's not good enough. And like I said, that's a fair inference, it's a competing inference, but Judge O'Connor reached a different conclusion based on his criminal history and- But you're saying that would be sufficient so long as Reed O'Connor accepted it. I think on the sum total of the record, it's Judge O'Connor's role to look at that defendant and say, you did this on purpose, or you've provided me with evidence that you didn't. And I do think- So intent does matter. It does. It has to be wrongful conduct that is action or inaction, right? I don't think fugitive tolling would apply if there was evidence that it was an accident, but here we have an explicit finding at the revocation hearing that it wasn't, that he intentionally failed to report to evade that component of his sentence. That inference was supported not only by his history, but by his conduct after he absconded. He didn't comply with any of the provisions of supervision that would have applied to him. He possessed controlled substances, possessed a firearm, didn't report, didn't engage in counseling. I don't want to interrupt you, Judge Southwick. You look like you have a question. You never know about what I'm doing over here. No, I didn't have a question. Committed other crimes. I'm waiting. Okay. So there were a list of conditions, not only beyond failure to report, that he didn't comply with, right? We're not just talking about a failure to report. We're talking about his continued violations that precluded the court from exercising supervision over him, which meant he didn't serve a single day of this key component of his federal sentence. If there's a textbook example of somebody that needs supervision, it's Mr. Swick. He's an established gang member. His first conviction was for crossing into Oklahoma, stealing guns, and bringing them back in to give to other gang members. That sentence was served concurrent with a state sentence for engaging over 100 burglaries in the span of a month. He needed close federal supervision when he got out. He knew that. Federal supervision is not state parole. State parole is, we're going to let you out, and within three to six months, as long as you don't break the law again, you're going to be discharged from parole. Federal supervision is a list of stringent conditions, close supervision, and severe consequences if you don't comply. Mr. Swick knew that. He wanted nothing to do with that, so he walked away. Counselor, I think there's a legal issue in this case, too. Do you want to move to that? I do. And I want to start by talking about your question of the evidence from sort of this amorphous time period in the 80s and the 90s. I've done a fair amount of research myself. It's clear as mud. But I wanted to give you at least a couple... Is that clear? I think you're exaggerating. I wanted to give you a couple of cases that might help elucidate the issue. United States v. Crane, which is 979 F. 2nd 687. That's Ninth Circuit out of 1992. Sort of the quintessential case cited by the Ninth Circuit line of cases dealing with fugitive tolling. The court in Crane said, look, we don't rely on 4210. We don't rely on these parole statutes to find that the passage of time is not service of sentence. We rely on the common law doctrine of fugitive tolling. So it looked at that parole statutory framework and said, we don't need any of that because we have this centuries-old doctrine. Well, the centuries-old doctrine seems primarily to deal with incarceration. That it's told while the person is incarcerated on some other offense. And also told if somebody leaves prison for a while, not probation, but his sentence to serve is told while the person disappears and comes back. There seems to be very little law on tolling something that looks like supervision, or parole, or probation in a circumstance like this. I didn't put a question mark on that, but that was meant to be a question. Is that a fair assessment of the law? I think it's been applied in both contexts. The cases that I've found- Well, certainly recently since the format. But I'm talking about, if we're looking at what the law was, the common law that Carolina and Lopez- Right. Fanna wanted to deal with, try to find it. And maybe it is set out in this Ninth Circuit opinion, you say. But I'm asking you, is it? Some real history of something like this being told? So Anderson v. Coral was in the parole context, not the escape from custody context. You have Fisher, where you're talking about tolling it in the probation context. Which, of course, probation is imposed in lieu of imprisonment. I would say that the vast majority of recent case law does deal with more of the absconding from supervision, because it was a new scheme enacted by Congress by virtue of the Sentencing Reform Act. So the body of common law being relied on by the Cartagena opinion is certainly more premised on, like you said, serving the concurrent sentences or escaping from custody. But the court found that the logic and the reasoning behind that doctrine applied with equal force to this context. Because supervised release is a crucial component of the sentence. The defendant is obligated to serve that component of his sentence. And Mr. Swick here, in effect, served half his sentence. He did the custodial time, but he never did the supervised release term. He served not one day on supervised release. So why is this tolling? You were listening to my comments to your opposing counsel. It seems to me tolling means that you're extending the time period in which something is to be accomplished and when other words might go. That's not what's going on here. This is the original time period for Swick, during which he was supposed to be supervised, but he wasn't being supervised. So it's not really being tolled. I'm not sure there ought to be a difference. But nonetheless, factually, it doesn't look like tolling to me. It looks like you're trying to put in place something that wasn't in place. Right. And so the tolling comes in because of the date of revocation, not because the date of his violations. So when he got out in September of 2017, the original expiration date would have been September of 2019. We have to add 34 days onto the end of that because of a carceral term in state prison. So that would have bumped you 34 days into 2019. Well, then, of course, he gets picked up and serves a three-year sentence for evading arrest in a motor vehicle. So that kicks the can down the road by, my count, 970 total days. OK. So you add 970 days to the two-year term of supervised release, and that would get you to June 29, 2022. That would mean the court would have had to exercise its power to revoke unless a warrant had been issued before that date. Because the court didn't know that he had been released, and because he never reported for supervision, that didn't happen. But a warrant is not required for the court to exercise authority under the fugitive tolling doctrine. So the tolling comes in because Mr. Swick didn't come to the attention of the authorities until a couple months later, in September 2022, when he was picked up for the new federal offense. I think some of the arguments— So you're not really tolling the application of the conditions of supervised release. You're tolling the need to revoke. Yes. And I want to highlight the fact that a lot of hay has been made over his repeated arrests, and he was hiding in plain sight. And it's been 1,000 days since he started serving. This was not a case where he was revoked 10 years down the road because probation realized he never reported. The date that he could have been revoked, roughly June 29, 2022, he's picked up again September 15, 2022. That tolls the term of supervision again, because he's been in continuous custody since September 15, 2022. I confirmed with BOP that that term of state imprisonment was credited as time served towards this new federal sentence. So none of that counts towards his term of supervised release. At most, 73 days passed by the time—from the time that jurisdiction would have restarted until when they picked him up again in September of 2022. Well, Counselor, doesn't this argument about tolling run up against some inconsistency, at least with 3483I, which says when the revocation can occur after the period of supervision, so long as a warrant was issued before, which means there's a gap towards the end of revocation, where those are just—can't be dealt with, so long as he went into supervision and where else. And you have reversed that or eliminated—not reversed it. You've eliminated that when the person never reports to supervision at all. So if we're trying to read the statute and how it applies in different scenarios, it seems to me it's inconsistent with what 3483I is doing. So I think it's completely consistent. Well, of course. It's an equitable carve-out for when the defendant's wrongful action or inaction precludes the court from issuing that warrant. We have intentional conduct here in intentionally evading service of his sentence, which then directly led to the fact that the court wasn't aware that he was in violation and never issued the warrant. And that's why in Mont v. United States, the Supreme Court explained that preserving jurisdiction under 3583I is not a prerequisite to a court maintaining authority under 3624E, nor does it impact the tolling calculation under 3624E. So we know from the Supreme Court that 3583I is not a jurisdictional prerequisite to exercising tolling authority under 3624, which is why we have an equitable remedy. If you have a defendant whose wrongful action or inaction caused a warrant not to be issued, the courts have filled the gap with an equitable doctrine that says passage of time is not service of sentence. And we're going to step in to make sure that this defendant does not get a windfall from his own wrongful conduct in failing to report. We're not going to treat it as though he served his sentence. He's going to be held accountable for that, and he will be required to serve that term, which is exactly what happened in this case. I want to briefly address in the time that I have left the argument that the parole statutes were not carried over and that that's somehow evidence that fugitive tolling should not be applied. The case cited by the appellant, Barrier v. Beaver, does not treat 4210 as a fugitive tolling provision. It treats the sum total of provisions under 4210 much like the delayed revocation provision of 3583I. Barrier v. Beaver involved the government asking the court to toll the terms from the time that he failed to report. And the court declined and said, we're going to toll the period from issuance of warrant to execution of warrant. And it treated the sum total of those parts much like a delayed revocation provision where the court's jurisdiction was extended. So this is not a case of prior statute had A and B and the court carried A over. In fact, 3624E is not a direct carryover from the prior parole regime, which is another reason that you can't apply the negative implication doctrine. 3624E removes the prior parole scheme, gave the parole commission the discretion to decide if it would run new sentences concurrent or consecutive, and it did not include the 30 day temporal limitation. Congress looked at that and said, we're going to remove that discretion. And we're going to say non-custodial sentences run concurrent. Custodial sentences in connection with a conviction longer than 30 days are tolled. They'll be run consecutive. So it changed the scheme under both. You have both provisions incorporated. And the undercurrent through all of this is the steady beating drum of fugitive tolling. When you have a defendant who's wrongful conduct, removed them from the court supervision, in contravention of the very purpose of the supervised release statute, they're not going to be rewarded for that conduct. And they're going to be held to the terms of their sentence. Let me ask you. Counsel opposite mentioned the 1st and the 11th circuits rulings here. So don't we have a circuit split? I mean, our case in Cardena was withdrawn because the issue was moot. So we don't really have a case there. So my question to you, there's a split in the circuits, the 1st and 11th. I forget the other circuits, 3rd, 5th, or whatever. At any event, what's your response in terms of the split in, where this panel should be in the split? But some have rejected the argument that you're making, right? Right. The 1st and the 11th. So just succinctly, we'd have a circuit split, right? That is correct. We believe Cartagena-Lopez was properly decided. Cartagena-Lopez looked at the reasoning of the 1st, and it said that's not persuasive. We don't think expressio uneus should apply. Congress doesn't hide elephants in mouse holes. If it wanted to get rid of this centuries-old doctrine, it would, and it didn't. And we have to go through this convoluted 20-minute argument about this statute moving over and that statute moving over. If it meant to get rid of this well-established doctrine, it would have. That logic is sound. Its statutory interpretation is sound. Let me make sure I understand what you're saying. If Congress wanted to get rid of this well-established doctrine, it would have, how would it have done that? There would have been a footnote in the statute saying it's gone. Well, you could have communicated exclusivity by saying a defendant's term is only told during a later custodial sentence. You could have said, when a defendant absconds, the period is not told. There are a number of ways they could have been explicit about removing that doctrine from application, but they didn't do that. And so we believe the logic of Cartagena-Lopez is sound, that we should fall on the side of the 2nd, 3rd, 4th, and 9th circuits in applying the fugitive tolling doctrine, and that the 1st and the 11th circuits were erroneously decided. All right. Any other questions? All right. Thank you. Thank you. All right. Mr. Brown, you have your report. Thank you, Your Honor. Just a few quick points on the law before a quick conclusion on the facts. So I'll begin with Cartagena-Lopez. I think the panel on Cartagena-Lopez did the best they could with what it had. If you go look at the briefing in that case, the defendant had not raised the tolling issue before the district court, and they did not raise the tolling issue in the initial brief. So there's no development of the statutory or common law history, and there's no request for this court to apply negative implication. Now, moving on to the broader circuit split, if you go look at what the 9th, 2nd, 3rd, and 4th circuits have done, they aren't really applying negative implication either. They're just importing this common law rule, originally applicable to parolees and escaped convicts, into a new context. But I don't think the common law has any role to play in this new context, because supervised release is something completely new. For the first time ever, someone would serve a term of supervision not in lieu of an undercharged term of imprisonment, but as an in-between stage between imprisonment on the one hand and complete freedom on the other. So I don't think there's any room for the common law to apply. But even if it does, 3624E affects a change to the common law with clarity, for all the reasons that we discussed earlier, and with regard to 3583I, which supports the negative implication by rendering a fugitive tolling doctrine unnecessary. So long as probation is doing their job, there's no need for fugitive tolling, because a warrant will issue as soon as someone becomes a fugitive, and that will preserve the district court's authority to revoke. Let me ask you this. You may have already covered it, but why should we depart from Cartagena-Lopez? I think the best reason to depart from Cartagena-Lopez is the issue of the arguments that are presented in that case. The defendant simply did not present negative implication. Negative implication requires 20-minute arguments, because it depends on context, which includes the statutory scheme in its entirety. So those arguments weren't very well presented. Given the party presentation principle, we don't necessarily expect that panel to go beyond the arguments that were presented. So the panel primarily relied on the competing arguments then existing in the circuit split. Since then, the 11th Circuit has come in, and I think the 11th Circuit has done the best job of situating 3624E in both statutory and common law history. And the 11th Circuit also has done something, Judge Southwick, in response to a few of the issues you've raised, which is recognize that we're not really talking about fugitive tolling when we're talking about fugitives in supervised release, because the clock doesn't stop when they become a fugitive and then pick back up, because those conditions apply throughout the entire term and into perpetuity, as much as we have here. We're not saying that the sentence toll, the conditions didn't go away after he didn't appear for his initial meeting. They remain in place. We're just talking about the district court's authority to revoke, but 3583I already answers that question for us. With the last two minutes, I want to turn to the facts in hopes of illustrating the error with a few examples. If a client misses a meeting, I don't immediately assume that the client is a fugitive. And I could not infer from that missed meeting that they were a fugitive. I would need more information. I would need to conduct more investigation, which is what we'd expect probation to do if they had not dropped the ball in this case, but they did. And in the same way that you couldn't infer from a single missed drug test the defendant's refusal to comply with a condition requiring drug testing, the district court overlooked an evidentiary gap in this case and reached a conclusion that is not reasonably supported by the facts before it. Last, your honors, I just note that the district court, pardon me, the government has made quite a bit about Mr. Swick's criminal record, but that is not a factual basis the district court relied upon below to find that he was a fugitive. The district court's ruling on that point was very clear and consistent. You can see it between pages 79 and 85, which is the revocation transcript, but it's most clear at 84 and 85. The district court explains, I'm finding that you were a fugitive because I'm finding that you knowingly failed to attend that first meeting. So Judge Southwick, you had some good questions about whether or not that's a fair inference? I should thank you. Oh, you're welcome. But whether or not that's a fair inference is, I think, an interesting question. I'm taking that inference on its own terms. I'm just saying that even if that's true, even if we can infer that he knowingly failed to attend that initial meeting, that makes him a violator, not a fugitive, and there's a massive chasm between a discrete single-sinner omission on the one hand, and the types of acts or intent on the other that we would need to find fugitive status. If there are no further questions, I'll see you at the meeting. There is a question that probably was more for your able opponent. Let me ask you, I was struck by how probation and coming up with what the eight or nine different offenses were, Cho ended, didn't choose any outside of the time frame of the original supervised release, though there were other offenses, I think, that he committed after the end of that period, which is almost, I don't want to say it's an indication, it's whatever decision was made, but it's an avoidance of going beyond the initial period of tolling, the initial period of supervised release, and say any of those would be relevant to revoking the probation, the supervised release that he had, which is sort of counter to the argument being made here. Do you have any understanding on what your role was in district court as to why those eight or nine offenses, and not any that occurred later in 19 or 20, were used? I'm not sure, Your Honor. I guess my best guess would be this, that initial petition actually recommended just discharging Mr. Stwick entirely. It said, look, we dropped the ball, we neglected to capture his release from TDCJ, and we were not able to follow up on that initial failure to report. So just cut them loose, and we can deal with them on this new 922G count. The district court rejects that recommendation, orders probation to issue a petition, and perhaps the issue that you've identified was probation's way of addressing their initial concerns while nevertheless staying true to 362040. It's not really clear from the record, I don't know, but what is clear is that ultimately, probation dropped the ball here. They're the party that we would expect to do the investigation necessary to establish whether or not Mr. Stwick was a fugitive, and here they did nothing. Thank you, Your Honor. All right, thank you. Counsel's both sides, the case is well briefed and argued. We appreciate the enlightenment. The case will be submitted.